UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BRYAN L. POTTHAST,                    )
                                      )
            Plaintiff,                )
                                      )     No. 4:07CV00942 FRB
                                      )
        v.                            )
                                      )
                                      )
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
            Defendant.                )


**<u>MEMORANDUM AND ORDER</u>**


        This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All matters are pending
before the undersigned United States Magistrate Judge, with consent
of the parties, pursuant to 28 U.S.C. § 636(c).

**I.    Procedural Background**

        On May 10, 2005, Bryan L. Potthast ("plaintiff") filed
for Child's Benefits, Supplemental Security Income ("SSI"), and
Disability Insurance Benefits ("DIB").  (Administrative Transcript
("TR") at 28-29; 57-60, 107-09.)  Plaintiff alleged he became
disabled on July 1, 2000, at age 17, due to hypokalemic periodic
paralysis[1] and attention deficit disorder ("ADD").  (Tr. 182.)

_____

        [1]Hypokalemic periodic paralysis is an inherited disorder that causes
occasional episodes of muscle weakness and sometimes severe paralysis,
alternating with periods of normal muscle function.
http://www.nlm.nih.gov/medlineplus/ency/article/000312.htm

Plaintiff's applications were initially denied, and he requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 49; 50-54.) On August 28, 2006, a hearing was held before ALJ F. Terrell Eckert, Jr. in Creve Coeur, Missouri. (Tr. 274-90.) On December 22, 2006, ALJ Eckert issued his decision denying plaintiff's claims for benefits. (Tr. 8-16.) Plaintiff filed a Request for Review with defendant Agency's Appeals Council, and on March 22, 2007, the Appeals Council denied plaintiff's request for review. (Tr. 6; 3-5.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Hearing Testimony

During the hearing, the ALJ heard testimony from plaintiff, who was represented during the hearing by attorney Karen Bill. When questioned by the ALJ, plaintiff testified that he was born on November 23, 1983; was unmarried; and had, since the age of 3, lived with his grandparents in their home.[2] (Tr. 279.) Plaintiff completed the twelfth grade of high school and attended some special education classes, but testified that he spent only about ten percent of his time in special education classes. (Tr. 279-80.) Plaintiff testified that he was right handed, and was able to read and write without difficulty, but had some trouble with arithmetic involving large numbers. (Tr. 281.) Plaintiff

---

[2]The record indicates that plaintiff reported having been adopted by his grandparents. (Tr. 256.)

testified that he was five feet, eight inches tall and weighed 102 pounds, and that the least he had weighed in the last two to three years was 99 to 100 pounds. _Id._ He has not served in the military. _Id._

Plaintiff testified that he was currently working four days per week at the Wright City rest area, a job he obtained through a sheltered workshop.[3] (Tr. 281, 286.) Plaintiff's job included cleaning bathrooms, taking out trash, and "other assorted things." (Tr. 281-82.) Plaintiff testified that he was having no problems doing this work, and was paid $3.00 per hour. (Tr. 282.) Plaintiff testified that he had been working at the rest area for the past three to four months, and that there was always a supervisor on site. _Id._ Before working at the rest area, plaintiff worked in the sheltered workshop, building wooden crates and other things. (Tr. 283.) Plaintiff testified that the rest area job paid more than the crate-building job, and was easier inasmuch as it involved less work.[4] (Tr. 284.)

Plaintiff was then questioned by his attorney. Plaintiff testified that the supervisor at the rest area transported him to and from work each day. _Id._ Plaintiff testified that the supervisor did not help him with any other part of the job. _Id._

---

[3]The record indicates that plaintiff worked through the Warren County Sheltered Workshop, Inc., in Warrenton, Missouri. (Tr. 159.)

[4]The record indicates that plaintiff earned $2.03 per hour at his prior assignment, and that he worked 30 hours per week. (Tr. 159.)

Plaintiff testified that, when he worked the crate-building job, he sometimes had trouble working quickly enough to meet the required quota. (Tr. 285.) Before working at the sheltered workshop, plaintiff worked as a dishwasher at a Denny's restaurant in Warrenton, Missouri, but left this job because he could not keep up. Id.

Plaintiff testified that, "88 or 90 percent" of days, he felt so tired he could not stay awake, and that on his days off, he slept three to four hours per day. (Tr. 285-86.) Plaintiff testified that he felt he could not get enough sleep at night. (Tr. 286.) Plaintiff testified that this level of fatigue had been present for the last two to three years, and had been consistent during that time. (Tr. 289.) Plaintiff has a driver's license, and testified that he had to take the written portion of the test "at least ten times." (Tr. 286-87.)

Plaintiff testified that he sometimes, but "not very often", felt depressed. (Tr. 287.) Plaintiff described his depression as a lack of concern about what was going on around him, anhedonia, and lack of focus. Id.

The ALJ then asked plaintiff to specify the frequency and duration of his feelings of depression. Plaintiff testified that these feelings sometimes lasted one day and sometimes lasted part of one day, but never lasted more than one day. (Tr. 288.) Plaintiff denied any other problems other than fatigue. Id. Plaintiff denied that he tended to be more fatigued during the

periods when he was working, and testified that he just "stayed the same whether I'm working or not." (Tr. 289.)

B. <u>Medical Records</u>

The record indicates that, on July 28, 1999, plaintiff saw Van A. Hargraves, M.D., at the Tri County Family Practice in O'Fallon, Missouri, for a physical exam and tetanus shot. (Tr. 242.) Dr. Hargraves noted that plaintiff's physical exam was normal with "no significant problems" other than two past fractures, one in 1987 and another in 1994. <u>Id.</u> Dr. Hargraves updated plaintiff's immunizations. <u>Id.</u>

On July 2, 2000, plaintiff presented to the emergency room of Doctor's Hospital in Wentzville, Missouri with complaints of feeling faint, light headed, and profuse sweating. (Tr. 189-91.) The record indicates that plaintiff was transported to the emergency room via ambulance after having fainted in the kitchen of a Burger King. (Tr. 199.) Intravenous fluids were administered, and plaintiff underwent a radiological obstructive series with chest x-ray, which was normal. (Tr. 191, 201.) Plaintiff's potassium level was noted to be abnormally low at 2.6. (Tr. 195.) Plaintiff reported feeling much better and stated he wanted to go home, and was released with instructions to drink clear liquids, rest, eat grapes and bananas to increase his potassium levels, and

take K-Dur[5] after eating.  (Tr. 197.)

On September 13, 2000, plaintiff returned to Dr. Hargraves with complaints of episodes of dizziness, shaking, and possible seizures, but denied losing consciousness. (Tr. 238.)  It appears that plaintiff was referred to Philip Dean, M.D.  Id.

Plaintiff saw Dr. Dean on September 20, 2000.  (Tr. 226-28; 204.)  Plaintiff reported the fainting spell after having worked over a hot stove at Burger King, and Dr. Dean noted that plaintiff had been eating and drinking carbohydrates before the attack.  (Tr. 226.)  Upon exam, plaintiff was noted to be slow doing deep knee bends and rising to a standing position from a flat-on-the-floor position.  Id.  Plaintiff also had some mild proximal muscle weakness in the upper extremities and muscle ptosis,[6] right eyelid more than left.  Id.  Dr. Dean opined that these symptoms were consistent with hypokalemic periodic paralysis, but that other conditions should be ruled out.  Id.

Dr. Dean opined that plaintiff should avoid sugary carbohydrate drinks, and should switch to diet sodas and consume protein for breakfast.  (Tr. 226.)  Dr. Dean opined that plaintiff should avoid "prolonged work and cold."  Id.  Dr. Dean prescribed

---

[5]K-Dur is a potassium supplement.  Potassium is essential for the proper functioning of the heart, kidneys, muscles, nerves, and digestive system.  Potassium supplements are taken to replace potassium losses and prevent potassium deficiency.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601099.html

[6]Ptosis refers to a sagging or prolapse of an organ or part; especially a drooping of the upper eyelid.
http://www2.merriam-webster.com/cgi-bin/mwmednlm

Diamox,[7] which he identified as a "potassium sparing diuretic", and referred plaintiff to a dietician for low carbohydrate diet counseling. Id. Dr. Dean indicated that dietary therapy and low-dose Diamox commonly managed cases like plaintiff's. Id.

On approximately October 5, 2000, plaintiff saw Dietician Connie Gilbert, R.D., C.D.E., for assessment. (Tr. 221.) Ms. Gilbert noted that plaintiff's diet was poor, inasmuch as he consumed snack foods, pizza, cookies, sweet rolls, and cereal; ate very little meat; and that his fat and refined carbohydrate intake was high. Id. She instructed plaintiff on a low-sodium, low carbohydrate diet, and reviewed appropriate food sources with him. Id.

Plaintiff returned to Dr. Dean on October 20, 2000, and reported that he was staying on his diet, and having no more attacks. (Tr. 220.) Physical exam, including exam of plaintiff's ocular musculature, was normal. Id. He was continued on Diamox. Id.

Plaintiff returned on April 16, 2001 with complaints of persistent fatigue, but no fainting spells. (Tr. 216.) He reported feeling rested in the morning, and it was noted that he had not experienced periodic attacks necessitating an emergency room visit. Id. Physical and sensory examinations were essentially within normal limits. Id. Dr. Dean noted that

---

[7]Diamox, or Acetazolamide, is used as a diuretic; to treat glaucoma; to reduce the severity and duration of the symptoms of altitude sickness; and to control seizures in certain types of epilepsy.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682756.html

plaintiff's condition was stable on medication, and that his complaints of fatigue were likely related to low potassium levels. Id. Dr. Dean advised that plaintiff use Diamox and Provigil[8] to combat fatigue. (Tr. 216.)

Plaintiff returned to Dr. Dean on October 15, 2001. (Tr. 213-14.) Dr. Dean noted that plaintiff had hypokalemic periodic paralysis "and is fairly stable IF he eats breakfast and takes his meds as prescribed!" (Tr. 213)(emphasis in original.) Plaintiff complained of continued fatigue, but admitted that he had been skipping breakfast recently, and that he had been forgetting his medications. (Tr. 213-14.) Plaintiff had not, however, missed school or had any "drop attacks." (Tr. 213.) Plaintiff's physical and sensory examinations were within normal limits with the exception of slight ptosis and mild weakness, but a negative Gower's sign. Id. Plaintiff's gait was normal. Id. Dr. Dean noted that plaintiff weighed only 98 pounds, but that "dietary consult was refused at this time." Id. Dr. Dean noted that plaintiff was counseled on the importance of following a proper diet and taking his medications. (Tr. 213-14.) Dr. Dean recommended that plaintiff take a multivitamin and creatine monohydrate, a nutritional supplement. Id.

---

[8]Provigil, or Modafinil, is used to treat excessive sleepiness caused by narcolepsy (a condition that causes excessive daytime sleepiness) or shift work sleep disorder (sleepiness during scheduled waking hours and difficulty falling asleep or staying asleep during scheduled sleeping hours in people who work at night or on rotating shifts). http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a602016.html

Plaintiff returned to Dr. Dean on December 20, 2001. (Tr. 211.) Plaintiff reported that he had begun smoking recently to relax and combat stress. Id. Plaintiff reported routinely eating breakfast. Id. Physical exam was normal with the exception of mild ptosis. Id. Dr. Dean noted that plaintiff was doing well. (Tr. 211.) Dr. Dean did note, however, that plaintiff had no plans for after high school, and gave plaintiff the names of three vocational guidance counselors. Id.

Plaintiff returned to Dr. Dean on November 22, 2002 with complaints of a poor appetite, and it was noted that plaintiff's coverage under his parents' insurance would soon end. (Tr. 206.) Plaintiff reported that Diamox prevented the bad muscle cramps and emergency room visits he once had. Id. Plaintiff reported working making barrels, and reported a recent deer hunting outing that "went ok." Id. Dr. Dean wrote "no med side effects and meds seem to work as they are designed to. Quick relief from symptoms. No sedation nor non-Neuro system side effects such as rash or abdominal pains or dizziness he (complained of) fatigue on the Provigil . . an opposite effect." Id. Examination was normal with the exception of mild bilateral ptosis and decreased pinprick sensation in the legs. (Tr. 206.) Plaintiff reported that he was dating. Id.

In an October 20, 2004 letter to the Sheltered Workshop, Dr. Dean wrote that he had treated plaintiff from September 20, 2000 through November 22, 2002 for hypokalemic periodic paralysis,

which he explained caused profound weakness and even shortness of breath if plaintiff ate an improper diet or if his potassium level dropped too low. (Tr. 203.) Dr. Dean wrote that death could result if plaintiff did not take his potassium supplement, because low potassium levels could cause cardiac conduction problems. Id. Dr. Dean opined that plaintiff should see a Neurologist on a regular basis and that, because the family lacked funds for a private Neurologist, charity care may be available in St. Louis or Columbia, Missouri. Id. Dr. Dean also noted the name and telephone number of a reputable clinic plaintiff could contact for assistance. Id. Dr. Dean opined that plaintiff required a medication like Diamox to prevent life-threatening cardiac problems, along with dietary and lifestyle counseling and potassium supplements. (Tr. 203.) Dr. Dean wrote: "His last blood tests I have on record are from 8-15-02. I cannot be responsible for his care unless frequent appointments are made." Id.

On November 10, 2004, plaintiff saw Dr. Hargraves for a refill of Diamox and lab work. (Tr. 234.) On a symptom checklist, plaintiff denied currently experiencing all of the symptoms and problems listed, including shortness of breath, weight loss or gain, depression, severe sleep problems, and severe stress. (Tr. 236.) Plaintiff also checked "no" in the box marked "other". Id.

On this same date, plaintiff presented to St. Luke's Hospital for a nutritional and functional screening. (Tr. 243.) Plaintiff denied a poor appetite and involuntary weight loss or

gain; denied trouble with activities of daily living, walking or standing; and denied that he had suffered a decline in function over the last three months. Id. Plaintiff underwent metabolic lab testing, and his results, including his potassium level, all fell within the normal ranges. (Tr. 244.)

On August 6, 2005, plaintiff was seen by Riaz A. Naseer, M.D., and alleged hypokalemic periodic paralysis and ADD. (Tr. 245.) Plaintiff stated that he had experienced three to four hypokalemic periodic paralysis episodes since age 15 (plaintiff was 21 at the time of exam). Id. Plaintiff also reported that he had ADD, and Dr. Naseer noted that the report of plaintiff's psychological testing revealed a verbal I.Q. of 79; a performance I.Q. of 103, with a full scale I.Q. of 89. Id. Plaintiff gave no history of difficulties falling asleep or sleeping excessively, but did mention that he felt "somewhat tired" at times. Id. Plaintiff denied being depressed; denied psychiatric hospitalizations; and denied taking any medication for anxiety or depression. (Tr. 245-46.)

Dr. Naseer noted that plaintiff ambulated without any assistive device, and was able to get on and off the examination table without difficulty. (Tr. 246.) Physical exam was normal. Id.

Regarding plaintiff's mental status, Dr. Naseer noted that plaintiff's general appearance and hygiene were good; that he had an appropriate affect; and did not appear depressed, anxious or

nervous.  Id.  Plaintiff was noted to behave normally during the interview, with good eye contact and a normal conversational flow of thoughts.  Id.

Plaintiff's neurological examination was normal, and motor examination revealed normal strength and tone in the upper and lower extremities, and no evidence of sensory deficit.  (Tr. 246-47.)  Dr. Naseer noted that, although plaintiff was extremely thin, his muscle tone was normal.  (Tr. 247.)  Dr. Naseer opined that plaintiff had a normal neurological examination and had no signs of depression; and had no need for an assistive device.  Id.

On August 26, 2005, Robert Cottone, Ph.D., completed a Psychiatric Review Technique form.  (Tr. 137-49.)  Dr. Cottone opined that plaintiff had no medically determinable impairment. (Tr. 137, 149.)  Dr. Cottone noted that plaintiff was alleging ADD, and noted that plaintiff's function report indicated that plaintiff's parents had to remind him to take his medicine; that he had a short attention span; and that he did not follow spoken instructions very well.  (Tr. 149.)  Dr. Cottone noted that Dr. Naseer, in August 2005, found that plaintiff had an appropriate affect; did not appear depressed; conversed with a normal flow of thought; and did not appear anxious or nervous.  Id.  Dr. Cottone noted that plaintiff's neurological mental status exam was within normal limits, and that plaintiff's I.Q.'s were inconsistent with a mental retardation or borderline intellectual functioning pattern.  Id.

On this same date, Examiner R. Manning completed a Physical Residual Functional Capacity Assessment. (Tr. 150-57.) It was determined that plaintiff could occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds; could stand, walk and/or sit for six hours in an eight-hour day; and could push and/or pull without limitation. (Tr. 151.) It was noted that plaintiff had been treated for hypokalemic periodic paralysis from September 2000 through November 2002, and that he reported profound weakness and even shortness of breath if he ate an improper diet or if his serum K+ (potassium) level was too low. Id. It was opined that plaintiff would need a prescription like Diamox to prevent life-threatening cardiac problems. Id.

On December 22, 2005, plaintiff was seen by Saul Silvermintz, M.D., for an internal medicine evaluation. (Tr. 250.) Dr. Silvermintz noted that plaintiff was working six and one-half hours per day, five days per week, in a sheltered workshop. Id. Plaintiff complained of hypoglycemia and periodic paralysis. Id. Plaintiff reported being diagnosed five to six years ago and having many attacks until being placed on medication and that, since taking the medication, he has had no attack of paralysis in two years. Id. Plaintiff stated that he was taking medication, but could not remember the name of the pill. (Tr. 251.) Plaintiff stated that, now, if he over-exerted himself, he would feel weak. (Tr. 250.) Dr. Silvermintz noted that plaintiff was at times slow to respond to questions, and opined that plaintiff undergo a

-13-

psychological or psychiatric evaluation. Id. Plaintiff's examination was normal, and Dr. Silvermintz noted that plaintiff had "no positive physical findings." (Tr. 252.)

On May 9, 2006, plaintiff was seen by Georgia Jones, M.D., for a psychiatric examination. (Tr. 255.) Plaintiff complained of becoming depressed very easily, and trouble sleeping. Id. He denied hospitalizations and denied ever seeing a psychiatrist. Id. Plaintiff, 22 years of age at the time of examination, claimed his depression began in the seventh grade, and that he lost interest in everything. Id. Regarding his sleep problems, plaintiff stated that it took him 1-2 hours to fall asleep, and that at times he woke in the night and had trouble falling asleep again. (Tr. 255.) Plaintiff claimed to have a poor appetite and stated he did not eat vegetables. Id. Dr. Jones noted that plaintiff's concentration and focus wavered between good and poor. Id. Plaintiff claimed to have a short attention span; complained of feeling sad, blue, hopeless and helpless; and claimed that he quickly and easily lost interest in things. Id. Plaintiff reported working at the sheltered workshop. (Tr. 256.) Plaintiff stated that he was not currently taking any medications. (Tr. 255.)

Regarding plaintiff's direct mental status, Dr. Jones noted that plaintiff was pleasant and cooperative, but was somewhat concrete and somewhat intellectually slow. (Tr. 256.) Dr. Jones noted that plaintiff moved and spoke slowly and had fair eye

-14-

contact.  Id.  He was coherent, relevant and logical, and had no
tangents, flight of ideas or perseveration.  Id.  Plaintiff's mood
was "kind of sad"; his content of thought was normal; and he was
oriented to the present date and most current and past events.
(Tr. 256-57.)  Plaintiff successfully answered simple addition, but
stated he was unable to do multiplication and refused to attempt
proverb interpretation.  (Tr. 257.)  Dr. Jones diagnosed plaintiff
with major affective disorder, recurrent depression, and ADD, and
assigned a 50 GAF.  Id.  Dr. Jones opined that plaintiff understood
the meaning of applying for benefits, and was presently capable of
managing his own funds.  (Tr. 258.)

      The record indicates that, on August 10, 2006, plaintiff
underwent a sleep study at the Lincoln County Medical Center, and
was attended by Howard Goldberg, M.D., a sleep medicine specialist.
(Tr. 259.)  Plaintiff complained of sleep onset and sleep
maintenance insomnia, with excessive sleepiness.  Id.  The study
revealed a normal sleep efficiency; normal sleep latency; and
prolonged REM ("Rapid Eye Movement") latency; and normal oxygen
saturation.  Id.  Dr. Goldberg's impression was that there was no
evidence for significant sleep disordered breathing.  Id.  Dr.
Goldberg also noted that sleep onset insomnia and sleep maintenance
insomnia were both noted on the sleep questionnaire, but not seen
in the study.  (Tr. 259.)  Dr. Goldberg opined that plaintiff had
"inadequate sleep hygiene" inasmuch as he consumed four caffeinated
beverages and one-half pack of cigarettes per day despite his

complaints of insomnia, and kept an irregular sleep pattern on the weekends.  Id.  Dr. Goldberg recommended that plaintiff improve his sleep hygiene, including maintaining a regular bedtime and awakening time; sleeping in a quiet, dark room; and avoiding stimulants such as caffeine and nicotine.  Id.

The record also contains an August 21, 2006 letter from Carol Marlowe, the manager of the Warren County Sheltered Workshop where plaintiff worked.  (Tr. 111.)  Therein, Ms. Marlowe wrote that she believed plaintiff should stay in the sheltered workshop environment because of the structure it provided, inasmuch as he knew what was expected of him and benefitted from the repetitive structure.  Id.  Ms. Marlowe further indicated that plaintiff was given 40 hours or more per week.  Id.  She further indicated that plaintiff worked at a slow pace, and that he could be lazy at times.  Id.

## IV.  The ALJ's Decision

The ALJ began his discussion by noting plaintiff's implicit request that his adverse Title II/XVI determinations dated November 16, 2004 be re-opened, inasmuch as plaintiff was alleging the same onset date.  (Tr. 11.)  The ALJ found that the record contained no good reason to re-open those determinations; that the period pre-dating November 16, 2004 was barred per the doctrine of res judicata; and that any reference to evidence pre-dating November 16, 2004 was made only for historical purposes.  Id.  The

ALJ further noted that plaintiff was insured for a Period of Disability and DIB on November 16, 2004, but was no longer insured after June 30, 2005. Id. The ALJ concluded that, for purposes of a Period of Disability and DIB, disability must be shown during the November 16, 2004 through June 30, 2005 period. (Tr. 11-12.) Regarding plaintiff's application for child's benefits, the ALJ noted that, because plaintiff attained age 22 on November 23, 2005, disability must be shown during the November 16, 2004 to November 22, 2005 period. (Tr. 12.)

The ALJ noted that plaintiff had worked thirty to forty hours per week at the sheltered workshop since January 2005, but found that he had not engaged in substantial gainful activity since November 16, 2004, inasmuch as his monthly wages totaled $516.00 or less. Id. The ALJ found that plaintiff suffered from the severe impairment of hypokalemic periodic paralysis, but that this condition was not of listing-level severity. (Tr. 12-13.) The ALJ further found that plaintiff did not have a severe mental impairment. (Tr. 12-13.) The ALJ found that plaintiff had no past relevant work. (Tr. 13, 15.)

For his credibility determination, the ALJ cited Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984) and listed the relevant factors therefrom; and also cited the Regulations corresponding with Polaski and credibility determination. (Tr. 13-14.) The ALJ then discredited plaintiff's allegations of disabling limitations. Id. The ALJ then determined that plaintiff had the

residual functional capacity ("RFC"), since November 16, 2004, to perform a wide range of light work. (Tr. 14.) The ALJ opined that plaintiff could lift, carry, push or pull twenty pounds occasionally and ten pounds frequently, and sit, stand or walk six hours in an eight-hour day; but was restricted from fast-paced work, or work involving high-volume quotas. (Tr. 14.)

Using the Medical-Vocational Guidelines ("Guidelines" or "Grids"); specifically Medical-Vocational Rule 202.20 of 20 C.F.R. pt. 404, Subpart P, Appendix 2, Table No. 2, the ALJ determined that plaintiff had been able to perform work existing in significant numbers in the national economy since November 16, 2004, and found that plaintiff was not disabled and therefore not entitled to, or eligible for, a Period of Disability, DIB, SSI, or Child's Benefits. (Tr. 15-16.)

## V. Discussion

To be eligible for benefits under the Social Security Act, a plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health and Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace. It provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423 (d)(1)(A), 1382c(a)(3)(A). It further specifies that a person must be both unable to do his previous work and unable, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423 (d)(2)(A), 1382c(a)(3)(B); Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983). The claimant bears the burden of proving that his impairment is disabling. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

Because plaintiff was over 18 at the time of his applications, to be eligible for child's benefits under Title II of the Act, plaintiff must prove that he had "a disability that began before [he] became 22 years old." 20 C.F.R. § 404.350(a).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one

which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217, Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and

consider:

> 1. The credibility findings made by the ALJ;
>
> 2. The plaintiff's vocational factors;
>
> 3. The medical evidence from treating and consulting physicians;
>
> 4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;
>
> 5. Any corroboration by third parties of the plaintiff's impairments;
>
> 6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585–86 (8th Cir. 1992), quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139 F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992), citing Cruse, 867 F.2d at 1184.

In the case at bar, plaintiff argues that the ALJ improperly found that plaintiff did not have a severe mental impairment. In support, plaintiff notes that Drs. Silvermintz and Jones found that plaintiff was depressed, and that plaintiff lacks

medical evidence due to financial constraints. Plaintiff further challenges the ALJ's RFC determination, alleging that the ALJ failed to explain the basis for a limitation to work that was not fast-paced or that involved high-volume quotas, and failed to explain the basis for determining that this limitation did not erode plaintiff's ability to perform a wide range of light work. Plaintiff also appears to challenge the ALJ's reliance upon the Guidelines, inasmuch as plaintiff challenges the ALJ's use of "administrative notice" that the rule established that a significant number of jobs existed for plaintiff, and notes that it is unclear what authority provides that a significant number of light jobs are not fast-paced and do not involve high-volume quotas. In response, the Commissioner argues that substantial evidence supports the ALJ's decision.

A.    Step Two Determination

As noted above, the ALJ found that plaintiff's hypokalemic periodic paralysis was a "severe impairment", but was not of listing-level severity. The ALJ further found that plaintiff's alleged mental impairment was not severe. Plaintiff alleges error in the ALJ's conclusion that his mental impairment was not severe. The undersigned disagrees.

As noted above, at step two, the ALJ determines whether any of the claimant's alleged impairments are "severe". See 20 C.F.R. §§ 404.1520(c), 416.920(c). At this stage in the sequential evaluation process, the burden remains with the claimant.

-22-

Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000)(citing Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998)).  An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities.  Id.  As the ALJ noted in his decision, a mental impairment must significantly limit basic work activities such as using judgment; dealing with changes in a routine work setting; responding appropriately to supervision, co workers and usual work situations; or understanding, remembering and carrying out simple instructions. See 20 C.F.R. §§ 404.1521, 416.921.

Regarding plaintiff's claim of a disabling mental impairment, the ALJ noted that the record showed that plaintiff never had mental health treatment; never took psychiatric medications; and maintained a regular work schedule.  These factors weigh heavily against a finding that plaintiff had a disabling mental impairment.  Jones v. Callahan, 122 F.3d 1148, 1153 (8th Cir. 1997) (substantial evidence supported ALJ's conclusion that claimant did not have severe mental impairment, where claimant was not undergoing regular mental-health treatment or regularly taking psychiatric medications, and where his daily activities were not restricted from emotional causes); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicted her allegations of a disabling condition); Battles v. Sullivan, 902 F.2d 657, 659 (8th Cir. 1990) (ALJ properly denied

benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time); see also Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999) (the lack of prescription medication is inconsistent with allegations of a disabling impairment.)

The ALJ placed great weight on the opinion of Dr. Naseer, who conducted a thorough mental status evaluation of plaintiff and obtained entirely normal results. Plaintiff challenges this, inasmuch as he notes that Drs. Silvermintz and Jones[9] "noted that plaintiff was depressed." (Plaintiff's Brief at page 8.) A review of the record, however, reveals that the ALJ properly weighed the opinions of Drs. Naseer, Silvermintz and Jones.

In considering the weight to give the opinion of a treating or consultative physician, an ALJ is entitled to consider whether the opinion is supported by clinical observations and findings, and whether it is consistent with other evidence in the record. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986). It is permissible for an ALJ to discount or disregard the opinion of even a treating physician where other medical assessments "are supported by better or more thorough medical evidence." Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997). The ALJ may also discount the opinion of even a treating physician if that physician offers

---

[9]Both Drs. Silvermintz and Jones were consultative physicians. As discussed in detail, supra, plaintiff saw Dr. Silvermintz on December 22, 2005 for an internal medicine evaluation, and saw Dr. Jones on May 9, 2006 for a psychiatric examination.

opinions which are inconsistent with the physician's other findings, or are inconsistent with the balance of the other evidence of record.  See Id.

In this case, the ALJ noted that Dr. Naseer's evaluation of plaintiff yielded completely normal findings, and that plaintiff even denied having depression when Dr. Naseer questioned him.  This is consistent with plaintiff's hearing testimony, when plaintiff stated that he was not often depressed, and that when he was, the feeling never lasted longer than one day.  (Tr. 287-88.)  It is also consistent with the absence of mental health treatment and/or medication.

In giving only slight weight to Dr. Jones' opinion, the ALJ noted that her opinion was "grossly inconsistent" with plaintiff's lack of treatment and with his ability to work thirty to forty hours per week, "albeit in a sheltered workshop."  (Tr. 13.)  The ALJ further noted that Dr. Jones' opinion was inconsistent with plaintiff's educational history, inasmuch as plaintiff testified that, during high school, he attended special education classes only ten percent of the time.  Regarding Dr. Silvermintz, despite plaintiff's argument to the contrary, Dr. Silvermintz did not opine that plaintiff was depressed; he merely noted that plaintiff "seem[ed] to be" depressed.  (Tr. 250.)  Dr. Silvermintz did not diagnose plaintiff with depression or with any other mental impairment.  Furthermore, Dr. Silvermintz is apparently an internist, not a mental health specialist.  As noted

above, an ALJ is entitled to discount or even disregard a physician's opinion when other opinions are supported by better or more thorough medical evidence, or when the opinion is inconsistent with the balance of the evidence of record. See Ward, 786 F.2d at 846; Rogers, 118 F.3d at 602.

Plaintiff appears to challenge the ALJ's consideration of plaintiff's lack of medical treatment, inasmuch as he wrote that he did "not have a great deal of medical evidence due to financial constraints." (Plaintiff's Brief at page 8.) As the Eighth Circuit has noted, while evidence of financial hardship may justify a claimant's failure to obtain treatment, it is not an automatic excuse. Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992) (citing Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984)); Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989); Brown v. Heckler, 767 F.2d 451, 453 n. 2 (8th Cir. 1985). In this case, the record does not document that plaintiff ever sought free or low-cost medical care, even though Dr. Dean advised that plaintiff may find charity care in St. Louis or in Columbia, Missouri, and even provided the name and telephone number of a clinic plaintiff could contact for assistance. Assertions of lack of financial resources are not convincing where plaintiff did not take advantage of available medical assistance programs. Johnson, 866 F.2d at 275. Furthermore, while certainly not dispositive, the undersigned notes that plaintiff reported continuing to smoke cigarettes, although not in large quantities. See Brown v. Apfel, 221 F.3d 1341 (8th

Cir. 2000) (unpublished disposition)(ALJ properly discounted claimant's contention that he could not afford medication and treatment absent evidence showing that claimant sought low-cost or free medical care, and given evidence suggesting that he routinely bought beer and cigarettes.)

Although plaintiff does not challenge the ALJ's findings related to plaintiff's insomnia, the undersigned notes that the ALJ found this impairment to be non-severe, inasmuch as plaintiff's August 2006 sleep study demonstrated that plaintiff's difficulties stemmed from inadequate sleep hygiene, not from an impairment. The ALJ noted that the physician who performed the sleep study, Dr. Goldberg, opined that simple changes such as maintenance of a normal sleep schedule, sleeping in a quiet, dark room, and avoidance of stimulants would improve plaintiff's sleep. Dr. Goldberg recommended no follow-up medical treatment of any kind, and prescribed no medication. Such evidence does not support a finding of disability. See Battles, 902 F.2d at 659 (ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time).

Review of the ALJ's decision reveals that he properly considered plaintiff's alleged impairments and properly weighed the relevant medical opinions in conjunction with the balance of the evidence in the record as a whole. The undersigned concludes that substantial evidence supports the ALJ's determination that plaintiff did not have a severe mental impairment.

B.  Credibility Determination

Although plaintiff herein does not directly challenge the ALJ's analysis of plaintiff's credibility, he does make challenges related to the ALJ's RFC determination, and the undersigned will therefore examine the ALJ's credibility determination. See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) (it is clearly established that, before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility).

The Eighth Circuit has recognized that, due to the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski, 739 F.2d at 1321-22.  In Polaski, the Eighth Circuit addressed this difficulty and set forth the following standard:

> "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions."

> Id. at 1322.

Although the ALJ may not accept or reject the claimant's

subjective complaints based solely upon personal observations, he may discount such complaints if there are inconsistencies in the evidence as a whole.  Id.  The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003).  The foregoing Polaski factors are to be considered in addition to the objective medical evidence of record.  See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003).  When an ALJ considers the Polaski factors and discredits a claimant's subjective complaints for a good reason, that decision should be upheld.  Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).  The claimant's credibility is primarily for the ALJ to decide, and this Court's examination of the ALJ's decision is deferential.  Tellez, 403 F.3d at 957.

As noted, supra, the ALJ in this case cited Polaski and listed the factors therefrom.  The ALJ then thoroughly reviewed the evidence of record and noted numerous inconsistencies in the record to support the conclusion that plaintiff was not entirely credible. The ALJ noted that plaintiff reported working thirty to forty hours per week since January of 2005, and that the work was somewhat strenuous, inasmuch as it involved cleaning restrooms, disposing of trash, and building wooden crates.  The ALJ considered this to be "some evidence of an ability to work."  The ALJ further noted that, in November of 2004, plaintiff reported that he had no difficulty with activities of daily living.  Inconsistencies between

subjective complaints and daily living patterns diminish credibility. Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); see also Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004) (no error in partially discrediting claimant's testimony where her depressive disorder did not markedly impair her ability to perform the usual activities of daily living.)

The ALJ also noted that plaintiff told Dr. Naseer in August of 2005 that he experienced only three to four "episodes" related to hypokalemic periodic paralysis since age 15; had not had an episode since beginning medication; and that the record indicated that plaintiff had no need for treatment other than taking medication. The ALJ opined that these factors supported the inference that plaintiff's symptoms were not disabling. See Cox v. Astrue, 495 F.3d 614, 620 (8th Cir. 2007) (RFC determination was proper where claimant experienced intermittent symptoms and generally functioned reasonably well); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (claims of disabling symptoms may be discredited when the record reflects minimal or conservative treatment).

The ALJ noted Ms. Marlowe's opinion that plaintiff worked at a slow pace and needed the structure of a sheltered workshop; but that he could "be lazy at times." Evidence indicating a lack of motivation to work may be used as a credibility factor so long as it is not a dispositive one. See Ramirez v. Barnhart, 292 F.3d 576, 581 n. 4 (8th Cir. 2002).

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by <u>Polaski</u>, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from plaintiff's credibility. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. <u>Battles</u>, 902 F.2d at 660. Because the ALJ considered the <u>Polaski</u> factors and discredited plaintiff's subjective complaints for a good reason, that decision should be upheld. <u>Hogan</u>, 239 F.3d at 962.

B.    <u>RFC Determination and Reliance Upon the Guidelines</u>

As noted above, the ALJ in this case found that plaintiff retained the residual functional capacity to perform light work, provided he work only in jobs that did not involve fast-paced work or high-volume quotas. Based thereon, the ALJ determined that work existed in significant numbers in the national economy plaintiff could perform, and used the Guidelines to meet his burden of proving that significant jobs existed in the national economy that plaintiff could perform. Plaintiff challenges this finding, arguing that the ALJ failed to explain the basis for limiting plaintiff to jobs that did not involve fast-paced work or high-volume quotas. Plaintiff further contends that it is unclear what authority provides that a significant number of light jobs are not fast-paced and do not involve high-volume quotas. For the following reasons, the undersigned determines that substantial

evidence supports the ALJ's RFC determination, but fails to support the ALJ's reliance upon the Guidelines.

Regarding plaintiff's severe impairment of hypokalemic periodic paralysis, the ALJ noted, _inter alia_, plaintiff's treatment with Dr. Dean. The ALJ noted that Dr. Dean's treatment records clearly established that plaintiff's condition was well-controlled by diet and medication. Dr. Dean's treatment records indicate that plaintiff experienced severe fatigue when he failed to follow his prescribed diet or take his medication, but his condition was stable when he adhered to his dietary and medication regimens. (Tr. 213-14). This is consistent with the history plaintiff gave to Dr. Naseer that he had not had an episode related to his hypokalemic periodic paralysis since he began taking medication. Impairments controllable or amenable to treatment do not support a finding of disability. _Hutton v. Apfel_, 175 F.3d 651, 655 (8th Cir. 1999).

The ALJ also noted Dr. Hargraves' November 2004 report indicating normal neurological results; Dr. Naseer's August 2005 report indicating normal neurological results; and Dr. Silvermintz's December 2005 report indicating normal neurological results. The lack of medical evidence supporting a claimant's allegations is a factor to be considered. _Johnson v. Chater_, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact,

this was noted to be the "strongest support" in the record for the ALJ's determination). Furthermore, the undersigned notes that plaintiff did not seek regular, routine medical care for his hypokalemic periodic paralysis and, as discussed above, his financial situation offers no excuse. See Wingert v. Bowen, 894 F.2d 296, 299 (8th Cir.1990) (infrequent medical treatment suggests condition is not disabling).

Plaintiff contends that the ALJ failed to explain the basis for including in plaintiff's RFC a restriction from fast-paced, high-volume quota work. The Commissioner interprets this contention as an argument that the ALJ erroneously imposed these restrictions even though he did not find that plaintiff had a severe mental impairment. The Commissioner then correctly noted that it is proper to include non-severe impairments along with severe impairments in the assessment of a claimant's RFC. 20 C.F.R. §§ 404.1545(a)(2) and 416.945(a)(2). Furthermore, the ALJ noted Ms. Marlowe's opinion that plaintiff worked at a slow pace, and the undersigned notes that plaintiff testified that he had experienced trouble keeping up with the required quota while making the wooden crates. The undersigned further notes that plaintiff testified that he left his dishwashing job at Denny's because he was unable to keep up with the pace of the work. Substantial evidence supports the ALJ's inclusion of the aforementioned restrictions in plaintiff's RFC. An RFC determination is based on all the relevant evidence in the record. See 20 C.F.R. §§

-33-

404.1545(a)(1) and 416.945(a)(1).

However, substantial evidence does not support the ALJ's conclusion, based upon use of the Guidelines, that a significant number of jobs existed in the national economy that plaintiff could perform, with the limitations the ALJ assessed.    In Heckler v. Campbell, the Supreme Court upheld the validity of the rules contained in the Guidelines, noting that their use was appropriate "[w]here a claimant's qualifications correspond to the job requirements identified by a rule".    Heckler, 461 U.S. 458, 462 (U.S. 1983).    The Supreme Court also noted that the rules contained within the Guidelines only described "major functional and vocational patterns", and wrote "[i]f an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered." Id. at 463, n. 5.    Noting that "some claimants may possess limitations that are not factored into the guidelines," the Court wrote "[t]hus, the regulations provide that the rules will be applied only when they describe a claimant's abilities and limitations accurately." Id.

As noted above, in finding that plaintiff was able to perform light work, and had been able to perform work existing in significant numbers in the national economy since November 16, 2004, the ALJ relied upon Medical-Vocational Rule 202.20 of 20 C.F.R. part 404, Subpart P, Appendix 2, Table No. 2, which considers plaintiff's education and ability to perform unskilled

-34-

work.  Furthermore, the undersigned notes that light work is
defined as follows:

> Light work involves lifting no more than 20
> pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very
> little, a job is in this category when it
> requires a good deal of walking or standing,
> or when it involves sitting most of the time
> with some pushing and pulling of arm or leg
> controls.  To be considered capable of
> performing a full or wide range of light work,
> you must have the ability to do substantially
> all of these activities. If someone can do
> light work, we determine that he or she can
> also do sedentary work, unless there are
> additional limiting factors such as loss of
> fine dexterity or inability to sit for long
> periods of time.
>
> 20 C.F.R. §§ 404.1567(b), 416.967(b).

Neither the pace of work, nor the volume of quotas a
worker would be expected to meet are included in the rule or in the
definition of light work.  Because the ALJ found that plaintiff was
restricted from fast-paced, high-volume quota work, limitations not
factored into the Guidelines or in the definition of light work, it
cannot be said that plaintiff's abilities and limitations were
accurately described therein.  The undersigned therefore determines
that it was error for the ALJ to rely upon the Guidelines to prove
that there are jobs that exist in substantial numbers in the
national economy that the claimant can perform, and this cause is
subject to remand to the Commissioner for consideration of
plaintiff's particular limitations.  Heckler, 461 U.S. 463, n. 5.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and this cause is remanded for further proceedings consistent with this opinion.

Judgment shall be entered accordingly.

_Frederick R. Buckles_
_____
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of September, 2008.